**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724 |
| | No.  16-MD-2724 |
| | HON. CYNTHIA M. RUFE |
| IN RE: LEVOTHYROXINE CASES | |
| THIS DOCUMENT RELATES TO: | 16-LV-27243 |
| *ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | Civil Action No. 17-cv-3820 |
| | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |

**INDIRECT RESELLER PLAINTIFFS'**
**AMENDED CLASS ACTION COMPLAINT**

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     THE ROLE OF INDEPENDENT PHARMACIES...................................................4

III.    JURISDICTION AND VENUE ...............................................................................5

IV.     PARTIES ................................................................................................................6

        A.      Plaintiffs .....................................................................................................6

        B.      Defendants ..................................................................................................7

        C.      Co-Conspirators .........................................................................................8

V.      INTERSTATE TRADE AND COMMERCE ..........................................................9

VI.     FACTUAL ALLEGATIONS ................................................................................10

        A.      The Generic drug market is a commodities market, where competition historically
                has been keen. ..........................................................................................10

                1.      Generic drugs should lead to lower prices. ...............................10

                2.      Prescription drug prices in the United States are governed by institutional
                        safeguards, which are intended to keep drug prices competitive...............12

        B.      Defendants conspired to, among other things, raise Levothyroxine prices. ..........14

                1.      Defendants' dominance over Levothyroxine sales permitted them to fix
                        prices, and their abrupt price increases are otherwise inexplicable. ..........14

                2.      Defendants' collective market dominance permitted them to collude.......15

                3.      Defendants' effective prices were remarkably stable before skyrocketing
                        in the Class Period. ....................................................................15

                4.      As part of the conspiracy, Defendants increased their WAC benchmarks in
                        lockstep. .....................................................................................34

                5.      There are no significant shortages or other market changes that would
                        justify Defendants' price increases. ...........................................44

        C.      Defendants orchestrated their conspiracy through in-person meetings and other
                forms of communication. .........................................................................45

- i -

1.      Investor communications demonstrate an intent to fix and maintain supracompetitive prices to realize record profits. ....................................56

2.      Industry commentary indicates collusion is a plausible explanation for the increase in Levothyroxine prices ................................................................62

D.      Defendants' conduct in generic drug pricing is under investigation by the United States Congress, the DOJ, and the State Attorneys General.................................64

1.      In response to news reports of the dramatic rise in price of certain generic drugs, Congress launched an investigation into the dramatic rise in price of certain generic drugs. ................................................................................64

2.      The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers. ....................................................66

3.      Led by the State of Connecticut, at least 47 Attorneys General launched their own investigation of antitrust violations in the generic drug industry. ................................................................................................................72

E.      The Levothyroxine market is highly susceptible to collusion ..............................74

VII.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ............76

A.      The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy ...........................................76

VIII.   CONTINUING VIOLATIONS ........................................................................................81

IX.     DEFENDANTS' ANTITRUST VIOLATIONS................................................................81

X.      CLASS ACTION ALLEGATIONS ................................................................................84

XI.     CAUSES OF ACTION ....................................................................................................87

XII.    PRAYER FOR RELIEF ................................................................................................134

XIII.   JURY DEMAND ...........................................................................................................136

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.      **INTRODUCTION**

1.      This action brings claims on behalf of pharmacies ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants Lannett Company, Inc.; Mylan Pharmaceuticals, Inc., or Mylan, Inc.; and Sandoz, Inc. to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Levothyroxine sodium tablets ("Levothyroxine").

2.      Defendants were not alone in subverting the operation of a competitive marketplace for generic pharmaceuticals.  Defendants' anticompetitive conduct in the Levothyroxine market is part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals.

3.      Levothyroxine is a manufactured thyroid hormone that is the synthetic equivalent of the hormone thyroxine.  First manufactured in 1927, Levothyroxine is used primarily to treat thyroid hormone deficiency, or hypothyroidism.   Levothyroxine is on the World Health Organization's list of essential medicines, and patients who take it often need it for their lifetimes. In recent years it has repeatedly been featured on lists of the top ten most prescribed generic drugs, and as of June 2015, it was the most prescribed generic drug in the U.S. and constituted 2.7% of the entire generic drug market by number of prescriptions.

4.      Beginning in approximately September 2013 and continuing today (the "Class Period"), Defendants and co-conspirators engaged in an overarching anticompetitive scheme in the market for Levothyroxine to artificially inflate prices through unlawful agreements. Defendants caused the price of these products to dramatically and inexplicably increase as much as ████████████████████████  This increase was the consequence of an agreement among Defendants to increase pricing and restrain competition for the sale of Levothyroxine in

**FILED WITH REDACTIONS – PUBLIC VERSION**

the United States.  Defendants orchestrated their conspiracy through secret communications and

meetings, both in private and at public events, such as trade-association meetings ███████

████████████████████████████████████████████████████████████

████████ ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████

5.      Defendants' and other generic pharmaceutical manufacturers' conduct has resulted

in extensive scrutiny by federal and state regulators, including by the Antitrust Division of the

United States Department of Justice ("DOJ"), the United States Senate, the United States House

of Representatives, and the Attorneys General of at least 47 States and the District of Columbia

(the "State AGs").  The DOJ empaneled a federal grand jury in this District, which has issued

subpoenas relating to price fixing and other anticompetitive conduct in the generic pharmaceutical

industry, including to each Defendant here.

6.      The DOJ's and State AG's investigations followed a congressional hearing and

investigation prompted by the National Community Pharmacists Association's ("NCPA") January

2014 correspondence to the United States Senate Health Education Labor and Pensions ("HELP")

Committee and the United States House Energy and Commerce Committee requesting hearings

on significant spikes in generic pharmaceutical pricing.[2]  The NCPA's news release reported price

---

[1] *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-genericpharmaceutical-association/.

[2] News Release, *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say* (Jan. 8, 2014), *available at* http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

FILED WITH REDACTIONS – PUBLIC VERSION

hikes on essential generic pharmaceuticals exceeding 1,000% in some instances, according to its survey of over a thousand pharmacists.

7.   On December 12 and 13, 2016, the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).  The DOJ alleged that both Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of generic glyburide and doxycycline sold in the United States.  Each was charged with two felony counts under the Sherman Act (15 U.S.C. §1).  On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.  They continue to cooperate with the DOJ's ongoing investigation as they await sentencing.

8.   The DOJ has publicly acknowledged that its investigation overlaps with MDL 2724.  For example, the DOJ filed a motion for a stay of discovery in MDL 2724 noting that:

> Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here).[3]

9.   Soon after the DOJ filed criminal charges, at least 47 state Attorneys General led by the State of Connecticut also sued generic manufacturers Aurobindo, Citron, Heritage, and Teva, as well as Mayne and Mylan for bid rigging, price-fixing, and market allocation in connection with their sale of glyburide and doxycycline in the United States.  On March 1, 2017, the complaint in the State AG action was amended to, *inter alia*, add claims of an additional 20

---

[3] *See* Intervenor United States' Motion to Stay Discovery, *In re Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724 (E.D. Pa. May 1, 2017), ECF 279.

FILED WITH REDACTIONS – PUBLIC VERSION

state attorneys general, bringing the total number of state AGs prosecuting the action to 40.  Glazer and Malek entered into settlement agreements with the attorneys general on March 16, 2017.[4] Commenting on the scope of its current antitrust investigation, the Connecticut Attorney General ("CTAG") George Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies.  Way beyond…We're learning new things every day."[5]  On July 17, 2017, five additional attorneys general joined the action by filing a nearly identical complaint and a notice of related case.[6]

10.     As a result of Defendants' scheme to fix, maintain, and stabilize prices; rig bids; and engage in market allocation concerning Levothyroxine, independent pharmacies paid, and continue to pay, supracompetitive prices for Levothyroxine.

11.     Plaintiffs seek damages on behalf of themselves and members of an indirect purchaser Class caused by Defendants' and co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, in addition to the other causes of action enumerated below.

## II.     THE ROLE OF INDEPENDENT PHARMACIES

12.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

---

[4] John Kennedy, *Ex-Heritage Execs to Help States Probe Drug Price-Fixing*, Law360 (May 24, 2017), *available at* https://www.law360.com/competition/articles/927899/ex-heritage-execs-to-help-states-probe-drug-price-fixing?nl_pk=eb0b62b3-08e3-46ed-ac8a-7ab5fa616c07&utm_source=newsletter&utm_medium=email&utm_campaign=competition.

[5] Liz Szabo, et al., *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, The Daily Beast (Dec. 21, 2016), *available at* http://thebea.st/2haV9xg (emphasis added).

[6] *Arkansas v. Aurobindo Pharma USA, Inc.*, No. 17-cv-1180 (D. Conn.).

**FILED WITH REDACTIONS – PUBLIC VERSION**

13.     The overcharges resulting from Defendants' conduct are directly traceable through the distribution chain to independent pharmacies. Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must order the drugs for their patients pay the price the wholesaler charges. As a result, when drug manufacturers collude to raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

### III.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period Defendants transacted business throughout the United States, including in this District; Defendants resided, transacted business, were found, or had agents within this District; and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

16.     During the Class Period, Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of Levothyroxine in the United States, including in this District.  Defendants' conduct had a direct,

FILED WITH REDACTIONS – PUBLIC VERSION

substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

17.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of Levothyroxine throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for Levothyroxine that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.     PARTIES

### A.     Plaintiffs

18.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Levothyroxine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

19.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Levothyroxine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

20.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its

opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Levothyroxine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

21.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Levothyroxine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

22.     ~~Plaintiff Deal Drug Pharmacy ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug indirectly purchased and continues to purchase Defendants' generic Levothyroxine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.~~

**B.     Defendants**

23.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  During the Class Period, Lannett sold Levothyroxine in this District and throughout the United States.

24.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

25.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  In this complaint, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are together referred to as

FILED WITH REDACTIONS – PUBLIC VERSION

"Mylan."  During the Class Period, Mylan sold Levothyroxine to purchasers in this District and throughout the United States.

26.     Defendant Sandoz, Inc. ("Sandoz"), is a Colorado corporation with its principal place of business in Princeton, New Jersey.  During the Class Period, Sandoz sold Levothyroxine to purchasers in this District and throughout the United States.

27.     Defendants and their officers, agents, employees, or representatives have engaged in the conduct alleged in this Complaint while actively involved in the management of Defendants' business and affairs.

### C.     Co-Conspirators

28.     Various other persons, firms, entities, and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy. The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered. At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful monopolization as described herein.

29.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

FILED WITH REDACTIONS – PUBLIC VERSION

30.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.     INTERSTATE TRADE AND COMMERCE

31.     Defendants are the leading manufacturers and suppliers of Levothyroxine sold in the United States. Levothyroxine is produced by or on behalf of Defendants or their affiliates in the United States or overseas.

32.     During the Class Period, Defendants, directly or through one or more of their affiliates, sold Levothyroxine throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

33.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

34.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Levothyroxine, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

35.     The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Levothyroxine within the United States.

36.     Defendants' agreement to fix, maintain, and stabilize prices; rig bids; and engage in market allocation concerning Levothyroxine, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Levothyroxine prices, were intended to have, and had, a

direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## VI.    FACTUAL ALLEGATIONS

**A.    The Generic drug market is a commodities market, where competition historically has been keen.**

### 1.    Generic drugs should lead to lower prices.

37.    Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the Food and Drug Administration (the "FDA") requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand. By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product." [7]

38.    To encourage the production and sale of generic drugs, the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") simplified the regulatory hurdles that generic pharmaceutical manufacturers must clear prior to marketing and selling generic pharmaceuticals.  Instead of filing a lengthy and costly New Drug Application, the Hatch-Waxman Act allows generic pharmaceutical manufacturers to obtain FDA approval in an expedited fashion.

39.    Although equivalent from a safety and efficacy standpoint, generic versions of brand name drugs are priced significantly below their brand counterparts, and because of this, they

---

[7] FDA, *Drugs@FDA Glossary of Terms*, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

FILED WITH REDACTIONS – PUBLIC VERSION

rapidly gain market share from the brand beginning immediately following launch.  Indeed, in every state, pharmacists are permitted (and in many states required) to substitute a generic product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

40.    It is well established in economic literature that competition by generic products results in lower prices for drug purchasers.  In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price free from competitive market forces.  But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy counter substitution, and generics capture as much as 80% of the market or more within months of launch.  And as more generics become available, generic prices only decline further due to competition among generics, and the brand drug's share of the overall market erodes even faster.  These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval under the Hatch-Waxman Act.

41.    Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and the brand drug itself, and every year generic drugs result in hundreds of billions of dollars in savings to consumers, insurers, and other drug purchasers.

42.    A mature generic market, such as the market for Levothyroxine, has several generic competitors.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating

FILED WITH REDACTIONS – PUBLIC VERSION

feature and the basis for competition among manufacturers.[8]  Over time, generics' pricing nears

the generic manufacturers' marginal costs.

43.     Generic competition usually enables purchasers to purchase generic versions of the

brand drug at a substantially lower price than the brand drug. Generic competition to a single

blockbuster brand drug can result in billions of dollars in savings to direct purchasers, consumers,

insurers, local, state, and federal governments, and others.  Indeed, one study found that the use of

generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[9]

> **2.     Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

44.     Ordinarily, the price for a consumer product is set by the retailer based on the

amount the typical consumer is willing to pay.  But because of the unique features of the

prescription drug marketplace, prescription drug pricing for most consumers is not determined

between the retailer and the consumer.  Rather, because most consumers' prescription drug

purchases are reimbursed by public or private health plans, the pricing for prescription drugs is

determined by reimbursement agreements between these prescription drug payors, *i.e.*, health

plans and their prescription benefit managers, and the pharmacies that dispense drugs to the

payors' insured customers.

---

[8] *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/publication/10938.

[9] GPhA, Generic Drug Savings in the U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

45.     Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales. Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.

46.     To reduce the cost of prescription drugs, prescription drug payors developed Maximum Allowable Cost caps ("MACs") to determine the amount that pharmacies would be reimbursed for dispensing generic pharmaceuticals.  The MAC cap refers to the maximum amount that a payor will reimburse a pharmacy for a given strength and dosage of a drug.  A MAC cap thus represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.

47.     Payors set the MAC pricing of a drug based on a variety of factors, including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies for each of a drug's generic versions. MAC pricing is designed to incentivize pharmacies to purchase the least costly version of a generic drug available on the market, without regard to the manufacturer's list price.

48.     MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices.  Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug would expect that it would lose sales to a competing generic manufacturer whose price is not increased.

49.     Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price (or

maintain high prices in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.

**B.**     **Defendants conspired to, among other things, raise Levothyroxine prices.**

**1.**     **Defendants' dominance over Levothyroxine sales permitted them to fix prices, and their abrupt price increases are otherwise inexplicable.**

50.     The market for Levothyroxine is mature, as generic versions have been on the market for years.  In 2014 alone, Defendants' total revenue from sales of these products was approximately ████████████ █ ████████████████████████████████████
████████████████████████

51.     A mature generic market, such as the market for Levothyroxine, has several generic competitors.  As noted above, because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  In a market free from collusive activity, over time, generics' pricing would naturally near (and stay near) the generic manufacturers' marginal costs.

52.     At all times relevant for this lawsuit, there have been at least three manufacturers of Levothyroxine on the market.  Under accepted economic principles of competition, when there are multiple generics on the market, prices should remain at highly competitive, historic levels, and should not increase starkly as they did here absent anticompetitive conduct.  Drastic increases in Levothyroxine prices are themselves suggestive of Defendants' collective market dominance:

---

[10] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health"). IMS Health is the largest vendor of physician prescribing data in the United States and is widely relied upon in the generic pharmaceutical industry and elsewhere.  "Effective prices" represent actual transaction prices, as reported by IMS Health.

**FILED WITH REDACTIONS – PUBLIC VERSION**

if they did not already dominate the market, pricing excesses would be disciplined by losing market share to non-colluding competitors.

> **2.      Defendants' collective market dominance permitted them to collude.**

53.      During the Class Period, the Defendants dominated the market with about a ▇▇▇ share.  Likewise, before the Class Period, from December 2010 through August 2013, ▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

54.      In terms of revenue, in 2014, Defendant Lannett's sales to direct purchasers was roughly ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇

> **3.      Defendants'  effective  prices  were  remarkably  stable  before skyrocketing in the Class Period.**

55.      Before the Class Period, the effective prices of Defendants' Levothyroxine remained stable for years, as is typical in a mature market.  From December 2010 through August 2013, *i.e.*, for over two years leading up to the price-fixing conspiracy, the standard deviation percentage of mean prices for Defendants was no more than ▇▇

56.      As illustrated below, Defendants' effective prices inexplicably increased sharply beginning in September 2013:

**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**

57.     **Sandoz**: For over two years before the Class Period began, the average effective

price per unit of its products was as follows, and by August 2013 its effective prices were only

slightly higher:[11] But in September 2013, Sandoz began to increase its effective prices.

| Sandoz Product | Pre-Class Average | Price Aug. 2013 | Price Hike Sept. 2013 | Percentage increase |
|---|---|---|---|---|
| TAB .025 MG | | | | |
| TAB .05 MG | | | | |
| TAB .075 MG | | | | |
| TAB .088 MG | | | | |
| TAB .112 MG | | | | |
| TAB .125 MG | | | | |
| TAB .137 MG | | | | |
| TAB .15 MG | | | | |
| TAB .175 MG | | | | |
| TAB .1 MG | | | | |
| TAB .2 MG | | | | |
| TAB .3 MG | | | | |

58.     Sandoz's effective prices would continue to climb, peaking in the next couple years

and increasing as much as ▮▮▮ above pre-conspiracy price levels:

| Sandoz Product | Price Month | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | | | |
| TAB .05 MG | | | |

---

[11] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent. However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

FILED WITH REDACTIONS – PUBLIC VERSION

| Sandoz Product | Price Month | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .075 MG | | | |
| TAB .088 MG | | | |
| TAB .112 MG | | | |
| TAB .125 MG | | | |
| TAB .137 MG | | | |
| TAB .15 MG | | | |
| TAB .175 MG | | | |
| TAB .1 MG | | | |
| TAB .2 MG | | | |
| TAB .3 MG | | | |

59.     Even today, Sandoz's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy.  For example, in November 2016, its prices were as much as ▮▮▮ higher than in August 2013:

| Sandoz Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .025MG | | | |
| TAB .05MG | | | |
| TAB .075MG | | | |
| TAB .088MG | | | |
| TAB .112MG | | | |
| TAB .125MG | | | |
| TAB .137MG | | | |
| TAB .15MG | | | |
| TAB .175MG | | | |
| TAB .1MG | | | |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Sandoz Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .2MG | ███ | ███ | ███ |
| TAB .3MG | ███ | ███ | ███ |

60.    **Mylan**: For over two years before the Class Period began, the average effective price per unit of its products was as follows, and by August 2013 its effective prices were ███ ███. But in September 2013, Mylan began to increase its effective prices:

| Mylan Product | Pre-Class Average | Price Aug. 2013 | Hike Price Sept. 2013 | Percentage Increase |
|---|---|---|---|---|
| TAB .025 MG | | | | |
| TAB .05 MG | | | | |
| TAB .075 MG | | | | |
| TAB .088 MG | | | | |
| TAB .112 MG | | | | |
| TAB .125 MG | | | | |
| TAB .137 MG | | | | |
| TAB .15 MG | | | | |
| TAB .175 MG | | | | |
| TAB .1 MG | | | | |
| TAB .2 MG | | | | |
| TAB .3 MG | | | | |

61.    Mylan's effective prices would continue to climb, peaking in the next couple years and increasing as much as ███ above its pre-conspiracy price levels:

| Mylan Product | Peak Price Month | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | ███ | ███ | ███ |

FILED WITH REDACTIONS – PUBLIC VERSION

| Mylan Product | Peak Price Month | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .05 MG | | | |
| TAB .075 MG | | | |
| TAB .088 MG | | | |
| TAB .112 MG | | | |
| TAB .125 MG | | | |
| TAB .137 MG | | | |
| TAB .15 MG | | | |
| TAB .175 MG | | | |
| TAB .1 MG | | | |
| TAB .2 MG | | | |
| TAB .3 MG | | | |

62.     Even today, Mylan's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy.  For example, in November 2016, its prices were as much as ███ higher than in August 2013:

| Mylan Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | | | |
| TAB .05 MG | | | |
| TAB .075 MG | | | |
| TAB .088 MG | | | |
| TAB .112 MG | | | |
| TAB .125 MG | | | |
| TAB .137 MG | | | |
| TAB .15 MG | | | |
| TAB .175 MG | | | |

- 25 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Mylan Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .1 MG | | | |
| TAB .2 MG | | | |
| TAB .3 MG | | | |

63.    **Lannett**: For over two years before the Class Period began, the average effective

price per unit of its products was as follows, and by August 2013 its effective prices were generally

■■■■■■■■■■■■■■■■■. But in September 2013, Lannett began a drastic increase of its effective

prices:

| Lannett Product | Pre-Class Average | Price Aug. 2013 | Hike Price Sept. 2013 | Percentage Increase |
|---|---|---|---|---|
| TAB .025 MG | | | | |
| TAB .05 MG | | | | |
| TAB .075 MG | | | | |
| TAB .088 MG | | | | |
| TAB .112 MG | | | | |
| TAB .125 MG | | | | |
| TAB .137 MG | | | | |
| TAB .15 MG | | | | |
| TAB .175 MG | | | | |
| TAB .1 MG | | | | |
| TAB .2 MG | | | | |

64.    Lannett's effective prices would continue to climb, peaking later and increasing to

almost ■■■■■■■■■■■■■■■■■:

- 26 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Lannett Product | Peak Price Month | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | | | |
| TAB .05 MG | | | |
| TAB .075 MG | | | |
| TAB .088 MG | | | |
| TAB .112 MG | | | |
| TAB .125 MG | | | |
| TAB .137 MG | | | |
| TAB .15 MG | | | |
| TAB .175 MG | | | |
| TAB .1 MG | | | |
| TAB .2 MG | | | |

65.    Even today, Lannett's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy.  For example, in November 2016, its prices were as much as ▇ higher than in August 2013:

| Lannett Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | | | |
| TAB .05 MG | | | |
| TAB .075 MG | | | |
| TAB .088 MG | | | |
| TAB .112 MG | | | |
| TAB .125 MG | | | |
| TAB .137 MG | | | |
| TAB .15 MG | | | |
| TAB .175 MG | | | |

- 27 -

FILED WITH REDACTIONS – PUBLIC VERSION

| Lannett Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .1 MG | ███████ | ███████ | ███████ |
| TAB .2 MG | ███████ | ███████ | ███████ |

66.      Defendants' price increases coincide with increases in the average transactional

price for Levothyroxine reported by the Centers for Medicare & Medicaid Services:



- 28 -



Source: NADAC Price Data



Source: NADAC Price

**FILED WITH REDACTIONS – PUBLIC VERSION**



Source: NADAC Price Data



Source: NADAC Price Data

**FILED WITH REDACTIONS – PUBLIC VERSION**



FILED WITH REDACTIONS – PUBLIC VERSION



FILED WITH REDACTIONS – PUBLIC VERSION



FILED WITH REDACTIONS – PUBLIC VERSION



Source: NADAC Price Data

**4.     As part of the conspiracy, Defendants increased their WAC benchmarks in lockstep.**

67.     Although MAC pricing has been implemented to discourage unilateral price increases of generic drugs by setting an upper limit, an individual manufacturer's WAC increase influences the actual prices paid by all purchasers in the distribution chain.  This is the case here, where Defendants dominate the Levothyroxine market and set matching WACs in quick succession at or shortly before the start of the Class Period even though it meant increasing their benchmark prices by as much as ▮:[12]

---

[12] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. .025 mg tab | | | | | | |
| 1,000 ct. .025 mg tab | | | | | | |
| 100 ct. .025 mg tab | | | | | | |
| 90 ct. .025 mg tab | | | | | | |
| 1,000 ct. .025 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. 05 mg tab | | | | | | |
| 100 ct. .05 mg tab | | | | | | |
| 1,000 ct. .05 mg tab | | | | | | |
| 1,000 ct. .05 mg tab | | | | | | |
| 90 ct. .05 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. .075 mg tab | | | | | | |
| 1,000 ct. .075 mg tab | | | | | | |

- 35 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. .075 mg tab | | | | | | |
| 1,000 ct. .075 mg tab | | | | | | |
| 90 ct. .075 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .088 mg tab | | | | | | |
| 100 ct. .088 mg tab | | | | | | |
| 1,000 ct. .088 mg tab | | | | | | |
| 90 ct. .088 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .1 mg tab | | | | | | |
| 100 ct. .1 mg tab | | | | | | |
| 1,000 ct. .1 mg tab | | | | | | |
| 90 ct. .1 mg tab | | | | | | |
| 1,000 ct. .1 mg tab | | | | | | |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .112 mg tab | | | | | | |
| 100 ct. .112 mg tab | | | | | | |
| 1,000 ct. .112 mg tab | | | | | | |
| 90 ct. .112 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .125 mg tab | | | | | | |
| 100 ct. .125 mg tab | | | | | | |
| 1,000 ct. .125 mg tab | | | | | | |
| 1,000 ct. .125 mg tab | | | | | | |
| 90 ct. .125 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. .137 mg tab | | | | | | |
| 1,000 ct. .137 mg tab | | | | | | |

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct. .137 mg tab | ███ | ███ | ███ | ███ | ███ | ███ |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .15 mg tab | | | | | | |
| 1,000 ct. .15 mg tab | | | | | | |
| 100 ct. 15 mg tab | | | | | | |
| 90 ct. .15 mg tab | | | | | | |
| 1,000 ct. .15 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .175 mg tab | | | | | | |
| 100 ct. .175 mg tab | | | | | | |
| 1,000 ct. .175 mg tab | | | | | | |
| 90 ct. .175 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. | | | | | | |

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| .2 mg tab | | | | | | |
| 100 ct. .2 mg tab | | | | | | |
| 1,000 ct. .2 mg tab | | | | | | |
| 90 ct. .2 mg tab | | | | | | |

68.    Nor did Defendants stop in August and September of 2013.  In late April and May of 2014, they again raised their WACs at matching levels by increasing their benchmark prices approximately ██████

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .025 mg tab | | | | | | |
| 100 ct. .025 mg tab | | | | | | |
| 1,000 ct. .025 mg tab | | | | | | |
| 1,000 ct. .025 mg tab | | | | | | |
| 90 ct. .025 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. 05 mg tab | | | | | | |

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. .05 mg tab | | | | | | |
| 1,000 ct. .05 mg tab | | | | | | |
| 1,000 ct. .05 mg tab | | | | | | |
| 90 ct. .05 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .075 mg tab | | | | | | |
| 1,000 ct. .075 mg tab | | | | | | |
| 100 ct. .075 mg tab | | | | | | |
| 1,000 ct. .075 mg tab | | | | | | |
| 90 ct. .075 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .088 mg tab | | | | | | |
| 100 ct. .088 mg tab | | | | | | |
| 1,000 ct. .088 mg tab | | | | | | |

- 40 -

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 90 ct. .088 mg tab | █████ | █████ | ████ | ████ | ██████ | ███ |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. .1 mg tab | | | | | | |
| 100 ct. .1 mg tab | | | | | | |
| 1,000 ct. .1 mg tab | | | | | | |
| 1,000 ct. .1 mg tab | | | | | | |
| 90 ct. .1 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. .112 mg tab | | | | | | |
| 100 ct. .112 mg tab | | | | | | |
| 1,000 ct. .112 mg tab | | | | | | |
| 90 ct. .112 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. | █████ | █████ | ████ | ████ | ██████ | ███ |

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| .125 mg tab | | | | | | |
| 100 ct. .125 mg tab | | | | | | |
| 1,000 ct. .125 mg tab | | | | | | |
| 1,000 ct. .125 mg tab | | | | | | |
| 90 ct. .125 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. .137 mg tab | | | | | | |
| 1,000 ct. .137 mg tab | | | | | | |
| 90 ct. .137 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .15 mg tab | | | | | | |
| 1,000 ct. .15 mg tab | | | | | | |
| 1,000 ct. .15 mg tab | | | | | | |

- 42 -

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. 15 mg tab | | | | | | |
| 90 ct. .15 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .175 mg tab | | | | | | |
| 100 ct. .175 mg tab | | | | | | |
| 1,000 ct. .175 mg tab | | | | | | |
| 90 ct. .175 mg tab | | | | | | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .2 mg tab | | | | | | |
| 100 ct. .2 mg tab | | | | | | |
| 1,000 ct. .2 mg tab | | | | | | |
| 90 ct. .2 mg tab | | | | | | |

FILED WITH REDACTIONS – PUBLIC VERSION

**5.    There are no significant shortages or other market changes that would justify Defendants' price increases.**

69.    During the Class Period, there was no significant increase in the costs of making Levothyroxine, no significant decrease in supply, and no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for Levothyroxine.  Such price increases in a commodity product for which there were no significant increases in costs or demand and no significant decrease in supply would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

70.    Federal law requires that drug manufacturers report drug shortages.[13] None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Levothyroxine.  Nor do their Levothyroxine products appear on the current list of American Society of Health-System Pharmacists ("ASHP") Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010) or on any archived lists of the ASHP Current Shortage Bulletins from July 3, 2012, through today.  While archived ASHP lists from July 11, 2013, through March 4, 2014, do identify shortages of Pfizer's brand drug, Levoxyl, the notices provide assurances that "multiple Levothyroxine and AB-rated Levothyroxine oral tablets [remained] available."[14]

---

[13] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

[14] ASHP, Current Drug Shortage Bulletin (July 11, 2013); (January 31, 2014); (March 4, 2014), *available at*
https://webbeta.archive.org/web/20130731133623/www.ashp.org/DrugShortages/Current/Bulleti n.aspx?id=1013;
https://webbeta.archive.org/web/20140224002544/www.ashp.org/DrugShortages/Current/Bulleti n.aspx?id=1013;
https://webbeta.archive.org/web/20140327041955/www.ashp.org/DrugShortages/Current/Bulleti n.aspx?id=1013.

- 44 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

71.     Nor does any change in marketplace explain the rising prices—before the Class

Period, from December 2010 through August 2013, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

**C.     Defendants orchestrated their conspiracy through in-person meetings and other forms of communication.[15]**

72.     During the Class Period, Defendants conspired, combined, and contracted to fix,

raise, maintain, and stabilize prices; rig bids; and engage in market allocation concerning

Levothyroxine, which had the intended and actual effect of causing Plaintiffs and the other

members of the proposed Class to pay artificially inflated prices above prices that would exist if a

competitive market had determined prices for Levothyroxine.

73.     Beginning in September 2013, Defendants collectively caused the price of

Levothyroxine to increase dramatically.  Defendants' conduct cannot be explained by normal

competitive forces.  It was the result of an agreement among Defendants to increase pricing and

restrain competition for the sale of Levothyroxine in the United States.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

74.     In formulating and effectuating their conspiracy, Defendants engaged in numerous

anticompetitive activities, including, among other things:

> (a)     Participating, directing, authorizing, or consenting to the
> participation of subordinate employees in meetings, conversations,
> and communications with co-conspirators to discuss the sale and

---

[15] The allegations included in this section pertaining to ████████████████████████ are
based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in
*In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

**FILED WITH REDACTIONS – PUBLIC VERSION**

pricing of Levothyroxine in the United States;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market allocation or bid rigging for Levothyroxine sold in the United States;

(c)     Agreeing during those meetings, conversations, and communications to engage in market allocation or bid rigging for Levothyroxine sold in the United States;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Levothyroxine sold in the United States;

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)     Selling Levothyroxine in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Levothyroxine sold in the United States at collusive and noncompetitive prices.

75.     To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade-association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging, and similar means.

76.     These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market allocation scheme.

77.     The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the

- 46 -

DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[16]   The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[17]

78.     Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Levothyroxine, rig bids, and engage in market allocation concerning Levothyroxine, including, but not limited to, ███████████████████   In addition, Defendants regularly attended industry events hosted by ██████████

79.     The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for generic drug manufacturers."[18]   GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

80.     GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as

---

[16] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[17] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[18] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.

FILED WITH REDACTIONS – PUBLIC VERSION

business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[19]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

81.    Defendants Mylan and Sandoz have been regular members of the GPhA during the Class Period, and Defendant Lannett frequently attends GPhA meetings and events.  Regular members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[20]

82.    Several of Defendants high-ranking corporate officers have served on GPhA's Board of Directors during and before the Class Period, including the following:

a.    **2012 Board of Directors**: Tony Mauro, President of Mylan North America; Don DeGolyer, President and CEO of Sandoz;

b.    **2013 Board of Directors:** Tony Mauro, President of Mylan North America; Don DeGolyer, President and CEO of Sandoz;

c.    **2014 Board of Directors:** Tony Mauro, President of Mylan North America; Peter Goldschmidt, President and Head, North America at Sandoz;

d.    **2015 Board of Directors:** Marcie McClintic Coates, VP & Head of Global Regulatory Affairs for Mylan; Peter Goldschmidt, President and Head, North America at Sandoz; and

e.    **2016 Board of Directors:** Heather Bresch, CEO of Mylan; Peter Goldschmidt, President and Head, North America at Sandoz.

---

[19] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.

[20] *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION

83.     Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's board of directors.

84.     The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

85.     The HDMA is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[21]   HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. ███████████████████████████████████████ ████████████████████████████████

86.     According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

87.     ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████

---

[21] HDA, About, *available at* https://www.healthcaredistribution.org/about.

FILED WITH REDACTIONS – PUBLIC VERSION

88.     As further set forth below, meetings and events hosted by ███████████ ████████████ were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

89.     For example, in February 20-22, 2013, GPhA held its annual meeting in Orlando, Florida that was attended by representatives from Mylan and Sandoz.

90.     On April 20-23, 2013 NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida. NACDS's  2013 Annual Meeting was attended by representatives from Defendants, who were key executives for generic drug sales and pricing:

      a.    **Mylan**: Joe Duda, President; Robert Potter, SVP N.A. National Accounts and Channel Development; Tony Mauro, COO;

      b.    **Sandoz:** Samuele Butera, VP & Head, Biopharmaceuticals, NA; Jeff George, Global Head; Richard Tremonte, SVP, Global Generic Pharmaceuticals;

91.



**FILED WITH REDACTIONS – PUBLIC VERSION**

92.     On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Lannett, Mylan, and Sandoz.

93.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by the following representatives from all three Defendants, who were key executives for generic drug sales and pricing:

a.   **Lannett:** Arthur Bedrosian, President & CEO; William Schreck, COO; Justin McManus, Director, National Accounts; Kevin Smith, VP Sales & Marketing; Tracy Sullivan, National Accounts Manager; Laura Carotenuto, National Accounts Representative;

b.   **Mylan**: Mike Aigner, Director, National Accounts; Joe Duda, President; Kevin McElfresh, Executive Director, National Accounts; Robert O'Neill, Head of Sales, Generic NA; Robert Potter, SVP, National Accounts & Channel Development; Lance Wyatt, Director, National Accounts; Matt Cestra, Sr. Director Marketing; Rodney Emerson, Director, Pricing & Contracts; Edgar Escoto, Director National Accounts; Stephen Krinke, National Accounts Manager; Heather Paton, VP Sales, Mylan Institutional; Damon Pullman, West Regional Account Manager; Sean Reilly, National Accounts Manager;

c.   **Sandoz:** Peter Goldchmidt, President, Sandoz US & Head NA; Steven Greenstein, Director, Key Customers; Armando Kellum, VP, Sales & Marketing; Paul Krauthauser, SVP Sales & Marketing; Della Lubke, National Account Executive

94.     On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

95.     On February 19-21, 2014, GPhA held its annual meeting in Orlando, Florida that was attended by representatives from Mylan and Sandoz.

96.     ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

- 51 -



97.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.

NACDS's 2014 annual meeting was attended by the following representatives from Defendants,

who were key executives for generic drug sales and pricing:

> a.    **Mylan**: Joe Duda, President; Tony Mauro, President; Robert Potter, SVP N.A. National Accounts & Channel Development; Rob O'Neill, Head of Sales; Hal Korman, EVP & Chief Operating Officer;
>
> b.    **Sandoz**: Peter Goldschmidt, President Sandoz, US & Head, North America; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales & Marketing.

98.



**FILED WITH REDACTIONS – PUBLIC VERSION**

c.  ███████████████████████████████
    ███████████████████████████████
    ███████████████████████████████

99.     On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Lannett, Mylan, and Sandoz.

100.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from all Defendants, who were key executives for generic drug sales and pricing:

a.  **Lannett:** Kevin Smith, VP Sales & Marketing; Tracy Sullivan, Director, National Accounts; Grace Wilks, Director sales & Marketing; Justin McManus, Director National Accounts & Sales.

b.  **Mylan**: Joe Duda, President; Robert Potter, SVP N.A. National Accounts; Mike Aigner, Director, National Accounts; Tony Mauro, President; Kevin McElfresh, Executive Director, National Accounts; Gary Tighe, Director, National Accounts; Lance Wyatt, Director, National Accounts; Edgar Escoto, Director, National Accounts; Stephen Krinke, National Account Manager; Heather Paton, VP, Sales, Mylan Institutional; Sean Reilly, National Account Manager; Michael Scouvart, Head of Marketing, N.A.;

c.  **Sandoz:** Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers;

101.    Later in 2014, 2015, and 2016, Defendants continued to regularly attend trade-association meetings, conferences and events, including:

- October 27-29, 2014 GPhA meeting in Bethesda, Maryland
- February 9-11 GPhA Annual Meeting in Miami, Florida

- 53 -

FILED WITH REDACTIONS – PUBLIC VERSION

- ███████████████████████████████████████
- █ ██████████████████████████████████████
- April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida
- ███████████████████
- June 9-10, 2015 GPhA meeting in Bethesda, Maryland
- August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado
- ███████████████████████████████████████
- April 16-19, 2016, NACDS 2016 Annual Meeting in Palm Beach, Florida
- ████████████████████████████████
- August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts.

102.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.[22]

103.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[23]

---

[22] *See, e.g.*, Amended Complaint (Public Version) at ¶¶ 50-52, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056 (D. Conn. Mar. 1, 2017), ECF 168, *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[23] *Id.* at ¶¶ 53-60.

- 54 -

FILED WITH REDACTIONS – PUBLIC VERSION

104.    A large number of generic drug manufacturers, including all Defendants here, are headquartered in close proximity to one another in New Jersey and Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

105.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings, and dinners, these employees meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

106.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

107.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

108.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.

- 55 -

Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

> ### 1. Investor communications demonstrate an intent to fix and maintain supracompetitive prices to realize record profits.

109.    Defendants' public statements and admissions in their investor communications show that Defendants realized record revenues during the Class Period and emphasize a commitment to increasing generic pharmaceutical prices as well as maintaining them at supracompetitive levels.

110.    **Lannett:** On February 7, 2013, Lannett's CEO Arthur P. Bedrosian stated in an earnings call:

> I could just say that we're very capable of raising prices and we tend to sometimes lead the market. We see opportunities to raise a price, we take it. We don't sit back and wait for someone else to do it. So you might say we're a little more aggressive in the pricing arena. I'd just rather not focus on which products they were, which could negatively impact us and send the wrong message to my competitors who might think they can get my customers away by lowering the price.

111.    On the next earnings call, on May 8, 2013, Mr. Bedrosian was asked whether he was concerned "that [pricing for the Levothyroxine franchise] may change in the near term or [whether] it seem[s] relatively stable." He responded that he did not think that there is upcoming competition that would "have a major impact on us." Specifically, he explained the following:

> [W]ith this particular drug, there is some unusual aspects. The physicians and the patients have a lot of extra work in front of them every time they want to switch a patient to another product. So even if another generic comes along and offers the product at a lower price, most of the customers have rights of first refusal. So the likelihood is I will not lose one customer. I conceivably could lose profit margins. But in the past, where we've encountered competition from some generic brand, so let's just say are 1/3 the quality of the product that we sell, we've refused to match those prices and we've retained those customers. Sometimes we'll make

- 56 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

a bit of a compromise, but we've never actually had to match a competitor's price on this product. And as a result, because our product is never involved in recalls and we're a good supplier -- actually, a great supplier on the product, we're able to command a better share of the market and a higher price for our product. And I believe, while I expect there might be competition coming up, I really don't think it's going to have a major impact on us.

112.     On an earnings call later that year, on September 10, 2013, Mr. Bedrosian stated the following:

> We're not a price follower.  We tend to be a price leader on price increasing and the credit goes to my sales vice president.  He takes an aggressive stance towards raising prices.  He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company.  And he's the first step in that process.  I can reduce costs and manufacturing efficiencies, but it has to be combined with sales increase, a profit increase, as I should say, by the salespeople.  And he's done a good job there.  With 1 or 2 exceptions, we've tended to lead in the way of price increases.  We believe that these prices are important.  We need to try raising them.  Sometimes, it doesn't stick and we have to go back and reduce our price, and other times it does.  I am finding a climate out there has changed dramatically and I see more price increases coming from our competing – competitors than I've seen in the past.  And we're going to continue to lead.  We have more price increases planned for this year within our budget.  And hopefully, our competitors will follow suit.  If they don't, that's their issue.  But our plan is to raise prices on any product that we think we can or we haven't raised a price.

113.     When, on that same call, he was asked for a reaction to a competitor's recent and significant price increase on Levothyroxine -- Mr. Bedrosian first joked *"[y]ou mean after I sent them the thank you note"* adding no fewer than *three times* that he was "grateful" for the price increase: "I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well. . . . So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful." Further adding that he was "grateful to see price increases" and that "[t]his particular one that was done by a competitor

- 57 -

was – isn't price [indiscernible] by any -- just like they do any of the price increases, we don't necessarily see the benefits right away because most of the contracts that are in place usually give the customer a buy-in period. So if you're going to raise a price on them, which is generally not the case, they have an opportunity to place an extra order. So we don't really see the benefit for usually, at least one full quarter, let's say, because there's a 60-day buy-in. So I would probably be better able to answer this when we do our guidance for our first quarter sometime in November."

114.    On the same call, an investor asked Mr. Bedrosian whether he has any "any expectations for any new competitors" in connection with Levothyroxine. Mr. Bedrosian noted that "two possible competitors were in the wings . . . [b]ut hopefully, both companies turn out to be responsible companies and don't go into the marketplace." Mr. Bedrosian added that "[w]e're seeing more responsibility on the part of all of our competitors," adding that because of costs in the industry he "suspect[s] you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace."

115.    At the time of this call, and for several months before and after this call, (from around August to December 2013), the price of Levothyroxine saw approximate 100% price increases. Indeed, the durability of Levothyroxine's price increases was on display during the November 7, 2013 earnings call, when Mr. Bedrosian stated the following:

> I don't really see anything significant on the horizon that could cause us any pain, quite frankly. We're still conservatively run. We're still careful how we spend money. We still realize we're in a commodity business. While we're enjoying the success of the company, it's not getting to our heads in anyway.

116.    On the same call, Lannett's CFO Martin P. Galvan signaled that these were just the "earlier days of the increase," which Mr. Bedrosian explained meant that the "price increases that are going on in the industry [are] going to stick for all the companies."

FILED WITH REDACTIONS – PUBLIC VERSION

117.    On February 6, 2014, both Mr. Bedrosian and Mr. Galvan confirmed that the price increases were driving growth at Lannett.  Mr. Galvan further stated that "[w]e do believe strongly that there's sustainability in some of the price increases[.]" And on May 7, 2014, Mr. Bedrosian discusses the 50% price increase to Levothyroxine as part of Lannett's "selective price increases."

118.    On November 3, 2014, Mr. Bedrosian described one of Lannett's "rational" competitors as one that would not do "anything crazy" such as "just going out and trying to grab market share:" He went on to state:

> So from my perspective, what we're seeing here is an opportunity to raise prices because everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell.
>
> So it's really a combination to those things. So I don't think Levo and Digoxin are the only products that would sit here and tell you I could raise prices on, because I believe any of the products in our product line, including products that we may have just gotten approved have those same opportunities underlying them. We look at the market and sometimes we're the first ones to raise a price, sometimes we're not. But we look at everything in line as a potential product to have a price increased on.

119.    On this same call, Mr. Bedrosian responded to a question about Lannett's continued price increases on Levothyroxine. He remarked that "[i]n the case of Levo, we're already at 75% of the innovative brand," and noted that Lannett could stay at the price for the foreseeable future.

120.    On February 4, 2015, Mr. Bedrosian stated during an earnings call:

> If you're saying that the price increases that we've had in place, are they sustainable, and are they maintaining? My answer would be yes, they continue to hold up.
>
> As far as whether we talked about any increases for this year, we don't usually give a guidance for that. We predict what our revenues will be for the year. We're not seeing any declines, generally speaking on the price increase products. So they continue to, let's say, level off at their new pricing.

- 59 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

121.    Mr. Bedrosian further stated during the same call:

So I'm expecting these pricings to really sustain themselves to continue. I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced the product by 90%. It's because the generic marketplace has so much competition sometimes, people get desperate just to unload their inventory that they cut the prices.

We don't see that kind of behavior sustainable, and we don't see it going further into the future. I think you're going to find more capital pricing, more – I'll say less competition, in a sense. You won't have price wars. You are still going to have competition, because there's a lot of generic companies in the market.  I just don't see the prices eroding like they did in the past."

122.    On August 25, 2015, Mr. Bedrosian again signaled continuing price increases because they have been "sustainable" and because "it's a more rational market we're in."

123.    On August 23, 2016, Mr. Bedrosian summarized that price competition "usually doesn't get you to results you want. So, I think a lot of people have learned that lesson by now." He described a problem of "some of the dumber newer companies [that] continue to go down that path" of competing on price. Echoing the attitude of many price-fixers who seek to rationalize their misconduct, he equated "expertise" with raising prices, and contrasted it with "crazy behaviors" of companies who seek to gain market share by cutting prices. Mr. Bedrosian also said that these "occasional" competitors who attempted to compete on price were fortunately "maturing in the market in realizing they need to make it profit as well."

124.    Lannett reported rising revenues for its U.S. generics business during the Class Period.

125.    **Mylan**:  On February 27, 2013, Mylan's CFO, John Sheehan, stated in an earnings call:

FILED WITH REDACTIONS – PUBLIC VERSION

2013 will yet be another strong year for Mylan. In the U.S., we are anticipating a high volume of new product launches, and we expect to once again be agile enough to quickly seize new supply opportunities when they become available. In addition, favorable changes to the regulatory environment, including increased resources to expedite product reviews and greater oversight with respect to manufacturing, as well as an anticipated more stable pricing environment resulting in part from continued consolidation within the industry, are just two of the favorable macroeconomic factors that we see in 2013.

126.    On May 2, 2013, Mylan's CEO Heather Bresch stated in an earnings call: "From my perspective, we see the generic industry alive and well.  We still see a lot of runway room here in the United States."

127.    On May 1, 2014, Ms. Bresch stated in an earnings call: "We continue to see stability really across our entire generic line on pricing."

128.    On August 7, 2014, Ms. Bresch stated in an earnings call:

As far as pricing, look, I think that, that stability in our North American – that core business is certainly why we're able to deliver the results we have today, which, like I said, despite those product delays, we see growth year-over-year.  We've seen North America continue to maximize opportunities.

129.    On October 30, 2015, Mr. Sheehan stated in an earnings call:

With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained.  They have steadily increased over the last five, six years.  . . . It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

130.    On February 10, 2016, Ms. Bresch stated in an earnings call her belief that Mylan had been "a very responsible generic player with hundreds of products into the market and have shown very responsibly price erosion."

- 61 -

FILED WITH REDACTIONS – PUBLIC VERSION

131.    Mylan reported rising revenues in its United States generics business during the Class Period.

132.    **Sandoz**:  On January 29, 2014, the Division Head of Sandoz Jeffrey George stated:

> So I think overall what I would say is that we've been quite pleased with the acquisition of Fougera. It is a business that has performed very well for us, with strong double-digit growth and very good margins given the limited competition nature of a lot of these markets.

133.    On April 23, 2015, Novartis CEO Joe Jiminez stated that Sandoz had "strong financial results" and "the U.S. was up 13% . . . driven by . . . our Fougera dermatology business."

134.    On July 21, 2015, Mr. Jiminez stated: "Sandoz delivered very strong financial results with sales and profit up double-digit; as you can see this is driven by the division increased focus on core markets particularly the U.S., which is up 23%."

135.    Sandoz reported rising revenues in its United States generics business during the Class Period.

### 2.      Industry commentary indicates collusion is a plausible explanation for the increase in Levothyroxine prices

136.    Industry analysts agree that generic manufacturers' price hikes are consistent with a price fixing conspiracy.  For instance, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation.[24]

---

[24] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, Wall Street Journal (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/ 04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

**FILED WITH REDACTIONS – PUBLIC VERSION**

137.    According to one study, since 2013 approximately one in 19 generic drugs sold in the United States have undergone major price hikes that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law firms to bring litigation against companies, reported "anomalous pricing patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016.  It identified 90 medicines whose prices rose at least 250 percent over the three-year period and were increased by at least two drug companies around the same time, even though there was no obvious market reason for the increases.  The average price jump among the 90 drugs was 1,350 percent, Fideres found.
>
> "I don't think the public or even the politicians in the U.S. have any idea just how widespread and extreme the phenomenon is," said Alberto Thomas, one of Fideres's founders.[25]

138.    Another study concluded that in 2014, "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[26]  A United States Government Accountability Office ("GAO") report also noted similar "extraordinary price increases" across many generic drugs in recent years that could not be linked to any particular cause.[27]

139.    Pennsylvania physicians through the Pennsylvania Medical Society called on state and federal governments to investigate surging generic prices, believing anticompetitive conduct was to blame:

> According to Robert Campbell MD, chair of Physicians Against Drug Shortages and immediate past president of the Pennsylvania

---

[25] Liam Vaughan and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says*, Bloomberg (Dec. 22, 2016) *available at* https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds

[26] David Belk, MD, *Generic Medication Prices*, TRUE COST OF HEALTH-CARE *available at* http://truecostofhealthcare .net/generic_medication_prices/.

[27] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/679055.pdf.

- 63 -

FILED WITH REDACTIONS – PUBLIC VERSION

Society of Anesthesiologists, surging prices have hit hundreds of mainstay generics, including anesthetics, chemotherapeutic agents, antibiotics, and nutritional intravenous solutions. He believes the surging prices are a result of anti-competitive behavior.

"The truth is that drug shortages and price spikes are not terribly complex," says Dr. Campbell, adding that there's growing concern within the medical community. "If you consider one simple fact - high demand and low supply at high prices - what possible explanations are there for such a condition?"[28]

**D.      Defendants' conduct in generic drug pricing is under investigation by the United States Congress, the DOJ, and the State Attorneys General.**

**1.      In response to news reports of the dramatic rise in price of certain generic drugs, Congress launched an investigation into the dramatic rise in price of certain generic drugs.**

140.    As noted above, in January 2014 the NCPA sent correspondence to the United States Senate HELP Committee and the United States House Energy and Commerce Committee requesting hearings on significant spikes in generic pharmaceutical pricing.

141.    On October 2, 2014, Senator Bernie Sanders (I-VT), Chair of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, and Representative Elijah E. Cummings (D-MD), the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers requesting information about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses.[29]

---

[28] Pennsylvania Medical Society, Press Release, *Rising Generic Drug costs Have Physicians Raising Red Flags* (Feb. 5, 2016), *available at* http://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html.

[29] U.S. Senator Bernie Sanders Website, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

**FILED WITH REDACTIONS – PUBLIC VERSION**

142.    Senator Sanders and Representative Cummings issued a joint press release, advising "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" are having a "'very significant'" impact threatening pharmacists' ability to remain in business.[30]

143.    On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[31] The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[32]

144.    In August 2016, the United States GAO issued its report finding "extraordinary price increases" on many generic pharmaceuticals.

---

[30] *Id.*

[31] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[32] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* http://www.sanders.senate.gov/download /oig-letter-to-sen-sanders-4-13-2015?inline=file.

FILED WITH REDACTIONS – PUBLIC VERSION

2.      **The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers.**

145.    The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry on or around November 3, 2014.  The DOJ also empaneled a grand jury in this District at about the same time.

146.    News reports, court filings, and other public statements have confirmed the sweeping nature of the DOJ's investigation.  Reportedly, the DOJ believes price-fixing between makers of generic pharmaceuticals is widespread, and its investigation could become the next auto-parts investigation, which is the DOJ's largest prosecution to date.[33]  According to sources cited by Bloomberg, the DOJ investigation already "spans more than a dozen companies and about two dozen drugs."[34]

147.    Each of the Defendants here has been ensnared in the DOJ's ongoing probe.

148.    **Lannett**: Defendant Lannett issued a press release on July 16, 2014, that it received a subpoena from the CTAG in connection with its investigation into whether "anyone engaged in a contract, combination or conspiracy in restraint of trade or commerce which has the effect of (i) fixing, maintaining or controlling prices of digoxin or (ii) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law."[35]  In a quarterly

---

[33] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread—source*, Policy and Regulatory Report (June 26, 2015), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[34] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, Bloomberg (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[35] Lannett Website, Press Release, *Lannett Receives Inquiry from Connecticut Attorney General* (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

report Lannett disclosed that on November 3, 2014, its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[36]  Lannett reported: "The subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period." [37]

149.  **Mylan**:  Defendant Mylan disclosed in a 2016 filing with the United States Securities and Exchange Commission (SEC) that it received a DOJ subpoena "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products." [38]  Mylan received a similar subpoena from the CTAG, seeking "information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[39]

150.  Subsequently, on November 9, 2016, Mylan disclosed in its quarterly report that both it and "certain employees and senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with

---

[36] Lannett SEC Form 10-Q (Nov. 6, 2014) at 16, *available at*
https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[37] *Id.*

[38] Mylan SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at*:
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[39] *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION

competitors about such products."[40]  Significantly, Mylan disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[41]

151.   **Sandoz**: "In March 24, 2016, Sandoz Inc. received a subpoena from the Antitrust Division of the U.S. Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products sold by Sandoz Inc. and its subsidiaries, including Fougera Pharmaceuticals, Inc. (Fougera) and related communications with competitors. Sandoz Inc. is cooperating with this investigation which it believes to be part of a broader inquiry into industry practice."[42]

152.   Defendants are not alone.  Numerous other generic manufacturers have likewise received subpoenas in connection with the DOJ and the State AG's broad investigations into anticompetitive conduct in the generic drug industry.  Additionally, some of these generic manufacturers have disclosed that search warrants have been executed or that certain employees have been separately subpoenaed as part of these ongoing probes.

153.   The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[43]  The staff request needs to be approved by

---

[40] Mylan SEC Form 10-Q (Nov. 9, 2016), at 58, *available at*

https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdo
c.htm.

[41] *Id.*

[42] Novartis 2016 Annual Report at 217, *available at*
https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf.

[43] DOJ, Antitrust Division Manual (5th ed. 2015) at III-82.

FILED WITH REDACTIONS – PUBLIC VERSION

the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.[44]  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[45]  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[46]

154.    Receipt of federal grand jury subpoenas is an indication that antitrust offenses have occurred.

155.    That a target has reportedly applied for leniency is also significant.[47]  As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or

---

[44] *Id.*

[45] *Id.* at III-83.

[46] *Id.*

[47] Leah Nylen and Josh Sisco, *Generic drug investigation started small before ballooning to dozen companies*, mlex (Nov. 4, 2016) ("While the Justice Department didn't have a whistleblower at the beginning of the investigation, it is understood that [in the summer of 2016] a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations."), *available at* http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=841053&siteid=191&rdir=1.

FILED WITH REDACTIONS – PUBLIC VERSION

> production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id*.

156.    The DOJ's first charges were made on December 12, 2016, against two generic industry executives (Glazer and Malek) with criminal counts related to price collusion for generic doxycycline hyclate and glyburide.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

157.    These cases allege that these former senior executives of generic drug maker Heritage Pharmaceuticals Inc. violated Section 1 of the Sherman Act by participating in conspiracies to fix prices, rig bids, and engage in market allocation concerning generic glyburide and doxycycline.  On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.  The DOJ charges mention that Glazer and Malek's co-conspirators included "individuals that [Glazer] supervised at his company and those he reported to at his company's parent[.]"[48]  Sentencing for both Glazer and Malek was originally set for April 2017 but is currently in abeyance as they continue to cooperate with the DOJ.  Evidence reportedly unearthed in the State AG action shows that Malek compiled a large list of generic drugs and instructed employees to contact competitors

---

[48] Transcript of Jan. 9, 2017 Plea Hearing at 19, *United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 18, 2017), ECF 24.  A similar statement appears in the transcript from Malek's plea hearing.

**FILED WITH REDACTIONS – PUBLIC VERSION**

to reach agreement to increase prices and engage in market allocation, and that some of its competitors were willing to reach such agreement.

158.    The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price fixing, bid rigging, and market allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed."[49] The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that, "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."[50] As noted above, the DOJ also filed a motion for a stay of discovery in MDL 2724 stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here)."[51]

159.    The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every
> year and rely on generic pharmaceuticals as a more affordable

---

[49] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901 (S.D.N.Y. Feb. 21, 2017), ECF 112.

[50] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re Generic Digoxin and Doxycyclyine Antitrust Litig.*, MDL No. 2724 (J.P.M.L. Mar. 10, 2017), ECF 284.

[51] *See* Intervenor United States' Motion to Stay Discovery, *In re Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724 (E.D. Pa. May 1, 2017), ECF 279.

**FILED WITH REDACTIONS – PUBLIC VERSION**

alternative to brand name medicines. The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[52]

3.      **Led by the State of Connecticut, at least 47 Attorneys General launched their own investigation of antitrust violations in the generic drug industry.**

160.    The State AG action was filed just days after the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals. According to the State AG complaint, the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States. The State AG action alleges that the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different generic pharmaceuticals and competitors. As reported by *The Connecticut Mirror*, the CTAG "suspected fraud on a broader, nearly unimaginable scale" and "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[53] CTAG George Jepsen has called evidence that has so far been obtained in the State AG investigation "mind-boggling."[54]

161.    CTAG George Jepsen confirmed the scope of the State AG action in the following press release:

---

[52] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[53] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, The Connecticut Mirror (Jan. 27, 2017), *available at* https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena. *Id.*

[54] *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers – and, indeed, our healthcare system as a whole – who paid for these actions through artificially high prices for generic drugs. We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market.[55]

162.    During a conference call on July 27, 2017, W. Joseph Nielsen, an assistant AG for the State of Connecticut, said "he expects future actions by the group of states investigating price-fixing and market allocation in the generic drug industry" including "more lawsuits against additional generic manufacturers for additional drugs [and] lawsuits against high-level executives for their roles in the collusion."[56]  Mr. Nielsen also stated that the State AGs realized very quickly that the generic drug industry is "set up structurally in a way that fosters and promotes collusion among generic competitors and that the State AG investigation "has expanded greatly to the point where we are now looking at numerous drugs."  Accordingly, the States have noted in open court that complaints involving additional drugs and manufacturers will be filed in 2019.

---

[55] CTAG Website, Press Release, *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies* (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[56] Can Calik, *Future actions by state enforcers expected over generic drug collusion, Connecticut official says*, mlex (July 27, 2017), *available at* http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=908454&siteid=191&rdir=1.

**FILED WITH REDACTIONS – PUBLIC VERSION**

163.    New York AG Eric T. Schneiderman also reported that the State AGs have "uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States."[57]

164.    The DOJ and State AG investigations of alleged price-fixing and other unlawful conduct in the generic pharmaceutical industry are ongoing.

**E.    The Levothyroxine market is highly susceptible to collusion**

165.    Because Defendants' anticompetitive conduct constitutes a conspiracy to fix prices, which is a *per se* violation of Section 1 of the Sherman Antitrust Act, Plaintiffs need not define a relevant market.  However, there are features of the market relevant to this case that show both (i) that the market is susceptible to collusion and (ii) that the price increases were in fact the result of collusion and not the result of conscious parallelism.

166.    Factors showing that a market is susceptible to collusion include in this case:

   (1)    **High Level of Industry Concentration** – A small number of competitors (Defendants) control a significant market share for Levothyroxine, as detailed above.  In September 2013, at the outset of the Class Period the Defendants together accounted for roughly 99% of the market for these products.

   (2)    **Sufficient Numbers to Drive Competition** – While the market for Levothyroxine had a small enough number of competitors to foster collusion, the number of sellers was large enough that – given decades of experience with competitive generic pricing, and accepted models of how generic companies vigorously compete on price – one would have expected prices to remain at their historical, near marginal cost levels.  With the number of generic competitors such as there were here, historical fact and accepted economics teaches that – absent collusion – prices would have remained at competitive levels.

---

[57] New York AG Website, Press Release, *A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies* (Dec. 15, 2016), *available at* https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(3)    **High Barriers to Entry** – The high costs of manufacture, intellectual property, and expenses related to regulatory approval and oversight are among the barriers to entry in the generic drug market. By insulating against new entrants, these barriers to entry and others increase the market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

(4)    **High Inelasticity of Demand** – For the hundreds of thousands of prescriptions written annually for Levothyroxine, it is a necessity that must be purchased regardless of price hikes. This makes demand for these products highly inelastic. Defendants can significantly raise prices with minimal effect on quantity thus increasing overall revenue.

(5)    **Lack of Substitutes** – While there are other drugs on the market for the treatment of thyroid hormone deficiency, there are significant barriers to changing treatments. For some patients, Levothyroxine is the only effective treatment.

(6)    **Commoditized Market** – Defendants' Levothyroxine products are fully interchangeable because they are bioequivalent to one another by FDA standards. Thus, all manufactured versions of Levothyroxine are therapeutically equivalent to each other and pharmacists may substitute one for another interchangeably.

(7)    **Absence of Departures from the Market** – There were no departures from the market that could explain the price increases.

(8)    **Absence of Non-Conspiring Competitors** – Defendants have maintained supracompetitive pricing for Levothyroxine throughout the Class Period. Thus, Defendants have market power in the market for Levothyroxine, which enables them to increase prices without loss of market share to non-conspirators.

(9)    **Opportunities for Contact and Communication Among Competitors** – Defendants participate in the committees and events of the GPhA, █████ NACDS, █████ NPF, and other industry groups, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to, among other things, generic pricing.

(10)    **Size of Price Increases** – The magnitude of the price increases involved in this case further differentiates them from parallel price increases. Oligopolists seeking to test market increases need to take

measured approaches.  But here the increases are not 5% or even 10% jumps – the increases are of far greater magnitude.  A rational oligopolist, unaided by certainty that its ostensible competitors would follow, would not engage in such large increases.

(11) **Reimbursement of Generic Drugs** – This market, as with many generic markets, has institutional features that would inhibit non-collusive parallel price increases.  The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions.  As a result, the usual inhibition of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

167.   Through their market dominance, Defendants have been able to substantially foreclose the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs and the proposed Class Members inflated prices above competitive levels for Levothyroxine through unlawful price collusion.

## VII.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

168.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

169.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient

FILED WITH REDACTIONS – PUBLIC VERSION

information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

170.   Plaintiffs are purchasers who indirectly purchased generic Levothyroxine manufactured by one or more Defendants.  They had no direct contact or interaction with any of the Defendants in this case and had no means by which they could have discovered Defendants' conspiracy.

171.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

> (a)   Lannett's Code of Business Conduct and Ethics "promotes compliance with laws."[58]
>
> (b)   Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[59]
>
> (c)   Novartis's (the parent of Sandoz) Code of Conduct provides:  "We are committed to fair competition and will not breach competition laws and regulations."[60]

172.   It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

---

[58] Lannett Code of Business Conduct and Ethics, *available at* http://www.lannett.com/docs/2013_Code_of_Business_Conduct_and_Ethics.pdf.

[59] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[60] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

173. For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Concealment tolled the statutes of limitations**

174. In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

175. No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

176. As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Levothyroxine. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Levothyroxine they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Levothyroxine. Defendants' false statements and conduct concerning the prices of generic Levothyroxine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to

- 78 -

believe that they were purchasing generic Levothyroxine at prices established by a free and fair market.

### 1.    Active concealment of the conspiracy

177.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

178.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes.  Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts.  The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Levothyroxine.

179.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[61]

180.    The Defendants also gave pretextual reasons for price increases.  For example:

---

[61] State AG Amended Complaint ¶ 13.

FILED WITH REDACTIONS – PUBLIC VERSION

(a) Lannett stated in documents filed with the SEC in 2016: "We face strong competition in our generic product business."[62]  Lannett also told investors on a May 2017 call: "Yes, there is a lot of competition . . . .  People want to get their products on the market, so they suddenly go out there and offer a lower price.  So you have pricing pressure."[63]

(b) Mylan's parent company, Mylan N.V., stated in documents filed with the SEC in 2015 that "[t]he pharmaceutical industry is highly competitive" and that it "face[s] vigorous competition from other pharmaceutical manufacturers that threatens the commercial acceptance and pricing of our products."[64]

(c) Sandoz's parent company, Novartis AG, told the SEC in 2014: "Competition within the industry is intense and extends across a wide range of commercial activities, including pricing, product characteristics, customer service, sales and marketing, and research and development."[65]

181.  These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Levothyroxine to inflated, supracompetitive levels.

## 2.  Plaintiffs exercised reasonable diligence

182.  Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

---

[62] Lannett Company Inc., SEC Form 10-K (June 30, 2016) at 22, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465916141905/a16-13983_110k.htm.

[63] *Lannett Company Inc. at Deutsche Bank Health Care Conference* – Transcript (May 4, 2017).

[64] Mylan N.V., SEC Form 10-Q (May 8, 2015) at 76, *available at* http://investor.mylan.com/secfiling.cfm?filingID=1623613-15-9&CIK=1623613.

[65] Novartis AG, SEC Form 20-F (Jan. 29, 2014) at 54, *available at* https://www.sec.gov/Archives/edgar/data/1114448/000104746914000415/a2217883z20-f.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

183.     Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

184.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

185.     For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## VIII.   CONTINUING VIOLATIONS

186.     This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. As shown in the price charts above, Defendants continue to benefit from the effects of the conspiratorial price increases, as prices have not returned to the stable levels seen before the steep increases. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## IX.   DEFENDANTS' ANTITRUST VIOLATIONS

187.     During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for Levothyroxine sold in the United States.

188.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Levothyroxine sold in the United States. These activities included the following:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Levothyroxine in the United States;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for Levothyroxine sold in the United States;

(c)    Agreeing during those meetings, conversations, and communications to allocate customers for Levothyroxine sold in the United States;

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Levothyroxine sold in the United States;

(e)    Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

(f)    Selling Levothyroxine in the United States at collusive and noncompetitive prices; and

(g)    Accepting payment for Levothyroxine sold in the United States at collusive and noncompetitive prices.

189.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

190.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Levothyroxine at inflated and supracompetitive prices.

191.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

192.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Levothyroxine than they would have paid in competitive markets.

193.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacists, who cannot negotiate their acquisition costs. Wholesalers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Levothyroxine.

194.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for Levothyroxine has been artificially restrained;

(b)    prices for Levothyroxine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    purchasers of Levothyroxine sold by Defendants have been deprived of the benefit of free and open competition in the market for Levothyroxine.

FILED WITH REDACTIONS – PUBLIC VERSION

## X.     CLASS ACTION ALLEGATIONS

195.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that purchased Defendants' generic Levothyroxine products from September 1, 2013 through the present.

> This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

196.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[66] on behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Levothyroxine products from September 1, 2013 through the present. [67]

> This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate

---

[66] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

[67] Plaintiffs may seek to certify state classes rather than a single Damages Class.

- 84 -

families; (c) all pharmacies owned or operated by publicly traded companies.

197.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."

198.   While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

199.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Levothyroxine and/or engaged in market allocation for generic Levothyroxine sold in the United States;

(b)   The identity of the participants of the alleged conspiracy;

(c)   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)   Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)   Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

**FILED WITH REDACTIONS – PUBLIC VERSION**

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Levothyroxine sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Levothyroxine, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

200.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Levothyroxine purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

201.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

202.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

**FILED WITH REDACTIONS – PUBLIC VERSION**

203.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

204.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XI.     CAUSES OF ACTION

### FIRST COUNT

**Violation Of Sections 1 And 3 Of The Sherman Act
(On Behalf Of Plaintiffs And The Nationwide Class)**

201.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

202.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

- 87 -

203.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Levothyroxine, thereby creating anticompetitive effects.

204.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Levothyroxine.

205.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Levothyroxine have been harmed by being forced to pay inflated, supracompetitive prices for generic Levothyroxine.

206.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

207.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for generic Levothyroxine has been restrained, suppressed, and/or eliminated in the United States;

(b)   Prices for generic Levothyroxine provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)   Plaintiffs and members of the Nationwide Class who purchased generic Levothyroxine indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

208.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Levothyroxine purchased

FILED WITH REDACTIONS – PUBLIC VERSION

indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

209.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

210.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation Of State Antitrust Statutes[68]
### (On Behalf Of Plaintiffs And The Damages Class)

211.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

212.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Levothyroxine in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

213.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Levothyroxine and to allocate customers for generic Levothyroxine in the United States.

---

[68] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, Connecticut, District of Columbia, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

**FILED WITH REDACTIONS – PUBLIC VERSION**

214.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Levothyroxine at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Levothyroxine provided in the United States; and

(b)     participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

215.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Levothyroxine. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

216.     In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

217.     Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

218.     Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

219.     **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, *et seq.* Defendants' combinations and conspiracy had the

following effects: (1) price competition for generic Levothyroxine was restrained, suppressed, and eliminated throughout Alabama; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, *et seq.*

220.  **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq.* Defendants' combination and conspiracy had the following effects: (1) price competition for generic Levothyroxine was restrained, suppressed, and eliminated throughout Arizona; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

221.  **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business

and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Levothyroxine at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Levothyroxine. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Levothyroxine. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for generic Levothyroxine has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Levothyroxine provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Levothyroxine indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Levothyroxine than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including reasonable attorney's fees, pursuant to California Business and Professions Code § 16750(a).

**FILED WITH REDACTIONS – PUBLIC VERSION**

222.  **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.* Defendants' combination and conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Levothyroxine in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Levothyroxine in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Levothyroxine, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

223.  **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition

~~was restrained, suppressed, and eliminated throughout Illinois; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.[69]~~

224.    **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq.*

225.    **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq.* Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Levothyroxine, increasing the prices of generic Levothyroxine, preventing competition in the sale of generic Levothyroxine, or binding themselves not to sell generic Levothyroxine, in a manner that

---

[69] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

established the price of generic Levothyroxine and precluded free and unrestricted competition among themselves in the sale of generic Levothyroxine, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

226. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

227. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Levothyroxine prices

FILED WITH REDACTIONS – PUBLIC VERSION

were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

228.    **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

229.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity,

**FILED WITH REDACTIONS – PUBLIC VERSION**

or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

230.    **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

231.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq.*

232.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION

233.     **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

234.     **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, *et seq.* The conduct set forth above is a per se violation of the Act.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq.*

235.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

236.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in

restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

237.  **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

238.  **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the

- 101 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

239.   **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

240.   **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By

FILED WITH REDACTIONS – PUBLIC VERSION

reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

241.   **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

242.   **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann.

FILED WITH REDACTIONS – PUBLIC VERSION

9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

243.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq.*

244.    **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and

Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

244a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

244b. **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Levothyroxine and raised, fixed, maintained, and stabilized generic Levothyroxine prices at artificially high levels. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured

**FILED WITH REDACTIONS – PUBLIC VERSION**

in their business and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

245.    **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Levothyroxine than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

246.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

247.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[70]
### (On Behalf Of Plaintiffs And The Damages Class)

248.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[70] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia,~~

**FILED WITH REDACTIONS – PUBLIC VERSION**

249.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

250.    **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

251.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

---

~~Michigan~~, Minnesota, Nebraska, ~~Nevada~~, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina~~, South Dakota, ~~West Virginia~~, Wisconsin and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants increased prices of Levothyroxine, a medical supply, by 10% or more during the 30 days following a declaration of a state of emergency in Arkansas, in violation of A.C.A. § 4-88-303 *et seq.*[71]  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

252.   **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed,

---

[71] States of emergency for Arkansas were declared on at least January 3, 2013; January 17, 2014; March 3, 2014; April 28, 2014; and February 18, 2015; and September 8, 2015.

FILED WITH REDACTIONS – PUBLIC VERSION

sold, or distributed generic Levothyroxine in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Levothyroxine in the State of California within the meaning of § 17200, California Business and Professions Code; (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code; and Defendants unlawfully raised prices of Levothyroxine, a medical supply, by more than 10% during the 30 days following a declaration of a state of emergency in California, in violation of the California Penal Code § 396, thereby committing "unlawful" and "unfair" prohibited business

practices under § 17200.[72]. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Levothyroxine. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

253. **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act,

---

[72] States of Emergency for California were declared on at least August 22, 2012; July 12, 2013; August 9, 2013; August 22, 2013; August 23, 2013; September 20, 2013; September 30, 2013; October 31, 2013; January 17, 2014; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September 17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 22, 2015; July 31, 2015; September 11, 2015; September 13, 2015; and December 18, 2015; February 1, 2016; February 19, 2016; April 19, 2016; June 7, 2016; June 24, 2016; July 26, 2016; July 9, 2016; and August 16, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

Colorado Rev. Stat. § 6-1-101, *et seq*. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

254.   **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class

FILED WITH REDACTIONS – PUBLIC VERSION

Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

255.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

256.    ~~**Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade~~

- 112 -

Practices Act, Georgia Code § 10-1-370, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia

**FILED WITH REDACTIONS – PUBLIC VERSION**

~~Code § 10-1-370, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.[73]~~

~~257.   **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all~~

---

[73] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

~~purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

258.  **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

259.  **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Levothyroxine prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260.   **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants'

- 116 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

~~deception, including their affirmative misrepresentations and omissions concerning the price of~~ ~~generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to~~ ~~believe that they were purchasing generic Levothyroxine at prices set by a free and fair market.~~ ~~Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev.~~ ~~Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all~~ ~~relief available under that statute.~~

261.   **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

262.   **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or

obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants Sandoz and Mylan raised prices of Levothyroxine, which is "used to preserve, protect, or sustain the life, health, safety or comfort of persons," by more than 10% within 30 days of the termination of a state of emergency in New Jersey, in violation of N.J. Statutes § 56:8-107 *et seq.*[74] Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities

---

[74] States of emergency for New Jersey were declared on at least October 27, 2012; October 28, 2012; January 2, 2013; January 21, 2014; November 26, 2014; December 23, 2014; January 26, 2015; March 4, 2015; and January 22, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

263.    **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Levothyroxine were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Levothyroxine as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Levothyroxine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Levothyroxine, including their illegal conspiracy to secretly fix the price of generic Levothyroxine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of

the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Levothyroxine. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

264.   **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Levothyroxine that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Levothyroxine; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New

FILED WITH REDACTIONS – PUBLIC VERSION

York, New York class members who indirectly purchased generic Levothyroxine were misled to believe that they were paying a fair price for generic Levothyroxine or the price increases for generic Levothyroxine were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Levothyroxine would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Levothyroxine would have a broad impact, causing consumer class members who indirectly purchased generic Levothyroxine to be injured by paying more for generic Levothyroxine than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Levothyroxine in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

FILED WITH REDACTIONS – PUBLIC VERSION

265.    **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Levothyroxine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. Defendants charged "unreasonably excessive" prices for Levothyroxine, which is a good "consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property," in the 45 days following a declaration of a state of emergency by the Governor, in violation of North Carolina. Gen..Stat. § 75-38 and § 75-1.1.[75] The conduct of Defendants described herein constitutes consumer-oriented deceptive

---

[75] States of Emergency for North Carolina were declared on at least October 29, 2012; March 12, 2013; June 14, 2013; September 12, 2013; January 28, 2014; February 11, 2014; April 28, 2014; July 2, 2014; January 26, 2015; February 16, 2015; February 25, 2015; and October 1, 2015; January 20, 2016; and February 17, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Levothyroxine in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

266.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants'

FILED WITH REDACTIONS – PUBLIC VERSION

unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

267.    **Rhode Island:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased generic Levothyroxine for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

FILED WITH REDACTIONS – PUBLIC VERSION

levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**FILED WITH REDACTIONS – PUBLIC VERSION**

268.   **South Carolina:** ~~Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.~~[76]

269.   **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that

---

[76] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

270. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in West Virginia. Defendants deliberately failed

- 127 -

~~to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants'~~ ~~unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants~~ ~~affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic~~ ~~Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following~~ ~~effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated~~ ~~throughout West Virginia; (2) generic Levothyroxine prices were raised, fixed, maintained, and~~ ~~stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct~~ ~~substantially affected West Virginia commerce and consumers. As a direct and proximate result~~ ~~of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an~~ ~~ascertainable loss of money or property as a result of Defendants' use or employment of~~ ~~unconscionable and deceptive commercial practices as set forth above. That loss was caused by~~ ~~Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including~~ ~~their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine,~~ ~~likely misled all purchasers acting reasonably under the circumstances to believe that they were~~ ~~purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative~~ ~~misrepresentations and omissions constitute information important to Plaintiffs and members of~~ ~~the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants~~ ~~have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va.~~

**FILED WITH REDACTIONS – PUBLIC VERSION**

~~Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~[77]

271.    **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations

---

[77] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

272.   **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described

herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

### FOURTH COUNT

#### Unjust Enrichment[78]
#### (On Behalf Of Plaintiffs And The Damages Class)

273.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

274.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

275.    Defendants have unlawfully benefited from their sales of generic Levothyroxine because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully

---

[78] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

- 131 -

overcharged privately held pharmacies, who purchased generic Levothyroxine at prices that were more than they would have been but for Defendants' unlawful actions.

276.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

277.   Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

278.   Defendants have been enriched by revenue resulting from unlawful overcharges for generic Levothyroxine while Plaintiffs have been impoverished by the overcharges they paid for generic Levothyroxine imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

279.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

280.   Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

281.   The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Levothyroxine.

**FILED WITH REDACTIONS – PUBLIC VERSION**

282.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Levothyroxine are ascertainable by review of sales records.

283.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Levothyroxine.

284.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Levothyroxine, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

285.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Levothyroxine is a direct and proximate result of Defendants' unlawful practices.

286.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

287.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Levothyroxine derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

288.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Levothyroxine prices remain inflated above pre-conspiracy levels.

289.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Levothyroxine.

290.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Levothyroxine by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of

FILED WITH REDACTIONS – PUBLIC VERSION

the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

FILED WITH REDACTIONS – PUBLIC VERSION

### XIII.   **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Dated: April 1, 2019                                    Respectfully submitted,


                                                       */s/  Jonathan W. Cuneo*

Peter Gil-Montllor                                     Jonathan W. Cuneo
Christian Hudson                                       Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**                        Daniel Cohen
16 Court Street, Suite 1012                            Victoria Romanenko
Brooklyn, NY 11241                                     Blaine Finley
202-789-3960                                           **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                             4725 Wisconsin Ave., NW Suite 200
                                                       Washington, DC 20016
                                                       202-789-3960
                                                       jonc@cuneolaw.com

                                                       *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**